# UNITED STATES DISTRIC COURT
for the
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD CHARYCH | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:17- |
| | ) cv-00468-JS-GRB |
| | ) **AMENDED** |
| | ) **VERIFIED** |
| (1) SIRIUSWARE, INC., | ) **COMPLAINT** |
| Unites States subsidiary of a United Kingdom entity | ) |
| (2) ACCESSO TECHNOLOGY GROUP, PLC | ) |
| United Kingdom parent entity of SIRIUSWARE, INC. | ) |
| (3) AXESS NORTH AMERICA, LLC | ) |
| United States subsidiary of an Austrian entity | ) |
| (4) AXESS INTERNATIONAL, AG | ) |
| Austrian parent entity of AXESS NORTH AMERICA, LLC) |  |
| (5) ACTIVE NETWORK, LLC | ) |
| Formerly Resort Technology Partners, LLC | ) |
| (6) VISTA EQUITY PARTNERS, LLC | ) |
| Parent company of Active Network, LLC | ) |
| (7) SKIDATA, INC. | ) |
| United States subsidiary of an Austrian entity | ) |
| (8) SKIDATA, AG | ) |
| Austrian parent entity of SKIDATA, INC. | ) |
| | ) |
| | ) |
| Defendants, | ) |

F I L E D
IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y.

★    JUL 05 2017    ★

LONG ISLAND OFFICE

RECEIVED

JUL 0 5 2017

EDNY PRO SE OFFICE

Plaintiff, HAROLD CHARYCH, respectfully sets forth and alleges the following, upon

information and belief:

1.   Plaintiff, Harold Charych, is licensed to do business in the State of New York with

     principal place of business at 2 The Overlook, Poquott, NY 11733.

2.   Mountain Pass Systems, LLC was established in November, 2009 in the State of

     New York with its former place of business at 2 The Overlook, Poquott, NY 11733.

3. The Plaintiff owns the assets of Mountain Pass Systems, LLC including the intellectual property, software, products, and accessories via an asset transfer executed on January 5, 2017 and is doing business as a sole proprietor.

4. Defendant Siriusware, Inc. formerly known as Siriusware Salespoint Solutions, Inc., is a US corporation licensed to do business in the State of New Mexico with its principal place of business at 302 Camino de la Placita, Taos, New Mexico 87571 United States and is a subsidiary of Defendant Accesso Technology Group, Plc.

5. Defendant Accesso Technology Group, Plc is a foreign corporation duly registered to do business in the United Kingdom with its principal place of business at Unit 5, The Pavilions Ruscombe Park, Twyford, Berkshire, RG10 9NN, United Kingdom. Accesso Technology Group, Plc purchased Siriusware Salespoint Solutions, Inc. in December of 2013.

6. Defendant Axess International, AG is a foreign corporation duly registered to do business in the country of Austria with its principal place of business at Sonystrasse 18, 5081 Anif, Austria and is the parent company of Axess North America, LLC.

7. Defendant Axess North America, LLC is a US corporation licensed to do business in the State of Utah with its principal place of business at 6433 N Business Loop Rd, Park City, UT 84098 and is a wholly owned subsidiary of Axess International, AG.

8. Defendant Active Network, LLC is a US corporation licensed to do business in the State of Texas with its principal place of business at 717 North Harwood Street Suite 2500 Dallas, TX 75201. Active Network, LLC purchased Resort Technology Partners, LLC in 2011.

9.  Defendant Vista Equity Partners, LLC is a US corporation licensed to do business in the State of California with its principal place of business at 4 Embarcadero Center, 20th Floor, San Francisco, CA 94111. In 2013 Vista Equity Partners, LLC purchased Defendant Active Networks. LLC and may be liable under successor liability statutes.

10. Defendant Skidata, AG is a foreign corporation duly registered to do business in the country of Austria with its principal place of business at Untersbergstraße 40, 5083 Grödig, Salzburg, Austria. In 2009 Skidata, AG purchased 25% of Resort Technology Partners, LLC stock.

11. Defendant Skidata, Inc. is a wholly owned subsidiary of Skidata, AG and licensed to do business in the State of New Jersey with its principal place of business at One Harvard Way, Suite 5, Hillsborough, NJ 08844.

## FACTUAL BACKGROUND

12. The US ski resort industry experiences theft of services in its method of selling and validating lift tickets. Most ski resorts sell lift tickets with validity dates printed on the ticket face.

13. Many of the larger ski resorts that use resort management software, such as that sold by Defendants Accesso Technology Group, PLC with its subsidiary Siriusware, Inc. (hereinafter "Accesso Technology Defendants") and Defendant Active Network, LLC formerly Resort Technology Partners, LLC (hereinafter ("Defendant Active Network/RTP"), will print a barcode on the face of the ticket.

14.   At the ski lifts there are a number of ticket checking employees that will verify if the skiers have valid tickets by looking at the tickets or by using mobile computers to scan the barcodes printed on the tickets. This method is very inefficient and insecure resulting in an indeterminate number of skiers using the ski lifts without paying for lift tickets.

15.   Another way that ski resorts experience theft of service is by lift ticket transfer. A skier may buy a full day lift ticket but decides that he or she does not want to use the entire service and therefore he or she may give or sell the lift ticket to a third party, thus denying the ski resort of the revenue from the third party who would have purchased a ticket. Ticket transfer is illegal in most states.

16.   Based on an industry survey done by the Plaintiff in 2015, the loss of revenue through ticket transfer averages from 3% to 5% of total lift ticket sales. A larger ski resort typically does $60,000,000 in annual lift ticket sales so the loss can be between $1,800,000 and $3,000,000 per year.

17.   To improve the validation process, ski lift access gates products have been developed. These gate products allow a skier to ski through the gates and have their ticket validated by radio waves, similar to "Easy Pass" for auto tolls.  This method is called Radio Frequency IDentification or, commonly, RFID.

18.   There are only two companies that dominate almost 100% of the market for RFID gates products and RFID lift tickets for the US ski industry – Defendants Axess International, AG with its subsidiary Axess North America, LLC (hereinafter "Axess Defendants") and Defendants Skidata, AG with its subsidiary Skidata Inc. (hereinafter "Skidata Defendants").

4

19. The US ski resort industry is dominated by two ski resort management software companies - Accesso Technology Defendants and Defendant Active Network/RTP See Exhibit M for an article about the acquisition of Resort Technology Partners, LLC by Active Network, LLC.

20. Accesso Technology Defendants and Defendant Active Network/RTP control over 80% of the larger ski resorts in the US with each company controlling about 40% of the market.

21. Defendant Active Network/RTP promotes Skidata Defendants products whenever any of their ski resort customers are interested in gate products. See current Internet advertisement in Exhibit O where Defendant Active Network/RTP only promotes the products from Skidata Defendants

22. Exhibit P shows that the number one importer of Defendants Skidata, AG smart cards is Defendant Active Network/RTP.

23. Every ski resort known to Plaintiff that uses Skidata Defendants gate products also uses ski resort management software from Defendant Active Network/RTP.

24. Every ski resort known to the Plaintiff that uses Axess Defendants gate products also uses ski resort management software from Accesso Technology Defendants. .

25. Exhibit K is a typical Internet Ad that touts both Axess Defendants and Accesso Technology Defendants calling themselves "The Winning Combo For Gate Integration".

26. Exhibit Q is a training Power Point posted on the Internet by Accesso Technology Defendants. Slides 10 to 15 discuss the long term relationship that the Accesso Technology Defendants has with its "partner" Axess Defendants.

27. Page 13 of Exhibit Q has several ski resorts where products from Defendants Accesso Technology Defendants and Axess Defendants have been recently jointly implemented.

28. Skidata Defendants are only mentioned on page 18 and19 of Exhibit Q. The interface for Skidata Defendants has not been completed. It is not even for a ski resort but only for an amusement theme park called Dreamworld in Brisbane, Australia who must have requested this unusual combination.

29. Exhibit R is a page from Axess Defendants website that discusses the great relationship that Axess Defendants has with Accesso Technology Defendants and how easy the deployment of its gate products was for ski resort Big White located in British Columbia, Canada.

30. The Plaintiff has developed ski resort gate products that are superior in features and offered at a lower price than the gates systems sold by Axess Defendants and Skidata Defendants

31. The gates of Axess Defendants and Skidata Defendants use a type of RFID called High Frequency (HF) that has a limited read range of 2 to 3 feet. ,

32. Products that rely on HF RFID technology from Axess Defendants and Skidata Defendants don't do a good job of detecting RFID tickets of persons of shorter stature including children.

33. Exhibit N is an email from John McGregor, VP of Snow Sports for Boyne Resorts, the owner of 13 ski resorts, stating that Boyne Resorts will remove Axess Defendants gates from two of their resorts, Crystal Mountain Ski Resort located in

Thompsonville, MI and Brighton Mountain Ski resort locates in Brighton, UT and will go back to hand held bar code scanners.

34. Boyne Resorts had gate products from Skidata Defendants removed from its Big Sky Ski Resort, located in Big Sky, MT due to intermittent operations.

35. Besides the problems with intermittent operation for many ski resort customers, gates products sold by the Axess Defendants and Skidata Defendants do not detect ticket transfers.

36. However, Plaintiff has developed RFID ski lift access gate products and RFID tickets using another type of RFID technology called Ultra High Frequency (UHF). UHF RFID was developed for the retail supply chain and has a read range of 15 to 20 feet making the detection of RFID tickets much more robust.

37. Furthermore, Lift tickets using UHF RFID, such as those provided by the Plaintiff, are much less expensive than lift tickets using HF RFID. Because UHF RFID was developed for the retail supply chain, it is produced in very high volume, resulting in a lower price.

38. In addition, the amount of metal used to manufacture UHF RFID tickets is much less than for HF RFID ticket, thus reducing the manufacturing costs.

39. To add a UHF RFID inlay to a paper ticket will only increase the price of the ticket by 15 cents. Adding a HF RFID inlay to a paper ticket increases the price to more than a dollar.

40. The price of the Plaintiff's gate product is less expensive than gate products sold by Axess Defendants and Skidata Defendants

41.  Plaintiff's gate product was priced at $11,000 each whereas Axess Defendants gate product is priced at $13,500 each and Skidata Defendants gate product is priced at $16,000 each.

42.  The installation of Plaintiff's gate product was a lot more flexible than that of gate products sold by Axess Defendants and Skidata Defendants

43.  Plaintiff's gate product has ski like structures on the bottom, allowing it to be easily moved from one ski lift to another whereas the products made by Axess Defendants and Skidata Defendants have to be mounted on a overhead gantry and could not be moved at all once mounted.

44.  One of the most significant advantages of Plaintiff's gate products is that they detect ticket transfers, the most common and most widely perpetrated lift ticket frauds.

45.  Ticket transfers occur for daily tickets and for season passes.  For daily tickets, a skier who purchased a ticket valid all day may decide not to use all of the service and give or sell the ticket to a third party.

46.  The ski resorts have no way of knowing that a ticket transfer has occurred because the ticket is valid for the entire day and is not linked to the ticket owner in any way.

47.  For season passes, a small photo of the season pass owner is on the ticket, It is difficult to match the photo to the person using the ticket because of the small photo size and the face of the ticket user is usually covered with ski goggles, ski mask, scarf, or other ski attire.

48.  The Plaintiff holds a US patent, number 8,674,805, on the use of UHF RFID in a ski lift access gate and on using biometrics to detect ticket transfer.

49. For the skiing public, many commonly used biometrics do not work well. Facial recognition does not work well because skier faces are covered by ski masks, goggles, scarves and other ski apparel. Iris scanning does not work well because the eyes are covered by sunglasses or ski goggles. Fingerprint does not work well because skiers wear gloves or mittens covering their hands.

50. Ski resort customers would consider it invasive to ask them to remove articles of clothing before going through a gate product.

51. The Plaintiff's gate products have video cameras that video the skiers going through the gates and use image recognition technology to detect body joints in the image and to calculate the distances between joints.

52. These joint distances, such as the height to the shoulders joints, shoulder width joint to joint, upper arm and forearm length, etc. provide unique biometrics that can attach a skier's physical attributes to the RFID ticket ID.

53. If a ticket is swapped between skiers of different body shapes, the Plaintiff's gate products will detect it. More detail on the biometrics and how the system detects ticket transfer is described in a product brochure in Exhibit A.

54. The Plaintiff has been promoting the ski lift access gate products to the US ski resort industry.

55. The first operational prototype was tested in the winter of 2014 at Loon Mountain Ski Resort, located in Lincoln, NH; a pre-production product was tested in the winter of 2015 at Pico Mountain Ski Resort, located in Mendon, VT and production products were tested in the winter of 2016 at Sunday River Ski Resort located in Newry, ME.

56. In the summer and fall of 2016, the Plaintiff's gate products were ready to be sold to the US ski resort industry.

57. Gore Mountain Ski Resort, located at 793 Peaceful Valley Rd, North Creek, NY 12853, was interested in Plaintiff's products.

58. Gore Mountain is part of a three ski resort conglomerate that includes Whiteface Mountain located near Lake Placid in Wilmington, NY and Belleayre Mountain located at 181 Galli Curci Rd, Highmount, NY. These three resorts are considered the premier mountain resorts in New York State.

59. A product demo at Gore Mountain was a key factor for Plaintiff to commence sales to Gore Mountain, Whiteface Mountain, Belleayre Mountain and to other ski resorts in New York State and to ski resorts across the United States.

60. This key product demo was not allowed to happen due to the egregious actions of Accesso Technology Defendants.

61. Gore Mountain uses resort management software sold by the Accesso Technology Defendants as does Whiteface Mountain and Belleayre Mountain.

62. For ski resorts that use Accesso Technology Defendants or Defendant Active Network/RTP software, all ski resort equipment that validate lift tickets, such as mobile computers or ski lift access gates, must interface with this software in order to provide useful services to the ski resort. The Plaintiff's products must also interface to this software.

63. On Friday, October 21, 2016. The Plaintiff met with Mike Costantino, Gore Mountain's Information Technology Manager, Erin Fuller, an employee of the Gore Mountain IT department, and the person in charge of ticket sales to present

Plaintiff's products. Exhibit B is a copy of the Power Point presented to the Gore Mountain staff at the meeting.

64. On Monday, October 24, 2016 the Plaintiff received an email form Mike Costantino expressing his enthusiasm for Plaintiff's gate products and proposing that they be used on Gore Mountain's Nordic track. The email received from Mike Costantino is Exhibit C.

65. Through the end of October and beginning of November of 2016 the Plaintiff exchanged emails with Mike Costantino discussing various ways the Plaintiff's gate products could interface with the Accesso Technology Defendants' software through printer drivers and UHF RFID labels. These emails are in Exhibit D.

66. On November 3 of 2016 the Plaintiff sent an email to Mike Costantino stating that it would be best to work with Accesso Technology Defendants directly and do a proper interface. This email is contained in Exhibit E.

67. The Plaintiff did not need intellectual property from Accesso Technology Defendants or to have Accesso Technology Defendants alter their product. He just needed an interface to their software.

68. The interface is straightforward with little technical difficulty. The Plaintiff is an electrical and computer systems engineer by background and is very familiar with this type of interface. It requires two steps. There is a software module called SCANMAN owned by the Accesso Technology Defendants that is running on hand held mobile computers under the Windows Mobile (sold by to Microsoft, Inc.) operating system. The Accesso Technology Defendants needed to port this

software to another operating systems called Windows 10 (also sold by to
Microsoft, Inc.) to allow SCANMAN to run on the Plaintiff's product.

69. The second step was to add a driver to the Accesso Technology Defendants
software to allow tickets to be printed on a Zebra printer. The Accesso Technology
Defendants software already supports driver for many ticket printers and this was
adding another driver.

70. During research, the Plaintiff discovered that a Zebra printer driver has already been
implemented by Accesso Technology Defendants (see page 44 of Exhibit Q). The
entire effort to those knowledgeable in the field to interface the Accesso
Technology Defendants software to Plaintiff's products should take several weeks.

71. On November 10 of 2016, the Plaintiff received an email from Mike Costantino
breaking off contact with Plaintiff's company because he (Mike Costantino) was
not in a position to "ruffle the feathers with Siriusware as they are critical to the
smooth operation of ORDA's (New York State Olympic Development Authority)
many venue ticketing and sales systems."  This email is contained in Exhibit F.

72. The email further states that "Upon inquiring about Zebra printers, we were
immediately informed that Siriusware does not support 3rd party scanning/gate
solutions and quickly offered up their Access (Axess Defendants) products."

73. On page 44 of a power point presentation from the website of Accesso Technology
Defendants (see Exhibit Q), a driver for a Zebra printer already exits. The Accesso
Technology Defendants were very deceptive when they told Mike Costantino that a
Zebra printer driver did not exist.

74. Notwithstanding that the next sentence in Mike Costantino's email states "Not to say they wouldn't do it, but a request like that would not be cheap and would have to come from the powers-that-be in Lake Placid." This statement was a cursory way to tell the Plaintiff that business contacts were being cut off.

75. The Plaintiff sent an email to Mike Costantino the very same day stating that it was probably a mistake to get Accesso Technology Defendants involved and maybe the Plaintiff can just do a demo with Gore Mountain during the winter of 2017. This email is contained in Exhibit G. To this email there was no reply.

76. The Plaintiff has been in contact with the Accesso Technology Defendants since 2010 when he gave a presentation to Johnny Donaldson, then Hardware Specialist and an employee of Accesso Technology Defendants.

77. On January 2, 2014, the Plaintiff replied to a congratulatory email sent by Johnny Donaldson, still an Accesso Technology Defendants employee. The Plaintiff expressed a desire to work with Accesso Technology Defendants

78. The reply received from Johnny Donaldson is in Exhibit I. According to this email, a request to work with the Plaintiff can only come from a ski resort customer that is interested in using Plaintiff's product. Gore Mountain Ski Resort was going to be the Accesso Technology Defendants customer to request the interface to Plaintiff's product.

79. The Plaintiff received a letter from the Internal Revenue Service dated November 10, 2016 that informed the Plaintiff that he should no longer file tax forms for Mountain Pass Systems, LLC on form 1065 for partnerships and corporation

because of his sole ownership of the business. He should instead file as an individual on form 1040. The Internal Revenue Service letter is in <u>Exhibit J</u>.

80. Accesso Technology Defendants had denied Plaintiff the opportunity to sell his product to the ski industry. The Internal Revenue Service requirement was demanding that the Plaintiff change his status to a sole proprietership. These two reasons caused the Plaintiff to transfer all of the assets of Mountain Pass Systems, LLC to himself.

81. From product inception, all funding for product development were provided by the Plaintiff. During the last 5 years, the Plaintiff has invested over $350,000 in the development of the gate product.

82. To recoup some of that investment, having the company's assets in the Plaintiff's name as an individual would have made asset sales easier.

83. Other ski resorts are also interested in Plaintiff's products. These resorts had the potential of buying Plaintiff's products in large numbers.

84. The Plaintiff has been working with Boyne Resorts, the owner of 13 ski resorts, including Loon Mountain and Sunday River where Plaintiff's product was tested in 2014 and 2016, respectively.

85. Six Boyne ski resorts use resort management software from Accesso Technology Defendants and seven Boyne ski resorts use resort management software from Defendant Active Network/RTP.

86. Without an interface to Accesso Technology Defendants and to Defendant Active Network/RTP, no sales can be made.

87. The Plaintiff had been working with Powdr Resorts, the owner of 8 ski resorts including Pico Mountain where the Plaintiff's product was tested in 2015. All 8 resorts use software from Accesso Technology Defendants or from Defendant Active Network/RTP.

88. Without an interface to Accesso Technology Defendants and to Defendant Active Network/RTP, no sales can be made.


## COUNT 1

## RESTRAINT OF TRADE

89. In the appeals court ruling of EVERGREEN PARTNERING GROUP, INC, vs PACTIV CORP, etal on June 19, 2013, the justices made some notable explanations of the TWOMBLY vs BELL ATLANTIC ruling.

90. One pertinent to this action is on page 33: See, e.g., In re Text Messaging, 630 F.3d at 627-28 ("industry structure that facilitates collusion constitutes supporting evidence of collusion"); E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, 357 F.3d 1, 8 (1st Cir. 2004) ("The best example of a possible threat to competition exists where a market is already heavily concentrated and long-term exclusive dealing contracts at either the supplier or distribution end foreclose so large a percentage of the available supply or outlets that entry into the concentrated market is unreasonably constricted."); Todd v. Exxon Corp., 275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries.")

91. The ski resort management software market and the ski lift gate market are such highly concentrated markets with only two dominant resort management software companies and only two gate supplier companies.

92. Two of those companies, Resort Technology Partners, LLC, now owned by Defendant Active Network, LLC and Skidata Defendants have colluded when Skidata Defendants purchased 25% of Resort Technology Partners, LLC stock when it was an independent company.

93. This purchase shows monopolization of the industry and concentration of ownership into one co-mingled monopolist.

94. Being the largest share holder of Resort Technology Partners, LLC stock gave Skidata Defendants an opportunity to collude with Resort Technology Partners, LLC so they could tie-in Skidata Defendants' gate products whenever a ski resort wanted to purchase gate products.

95. Plaintiff met with Defendant Active Network/RTP's management in the spring of 2009 at the National Ski Area Association (NSAA) convention and informed them that an interface to Defendant Active Network/RTP software was materially relevant to Plaintiff's product.

96. Defendant Active Network/RTP's chief information officer verbally promised Plaintiff that it would provide the interface to its software.

97. Boyne Resorts also let Defendant Active Network/RTP know that an interface to Plaintiff's product was necessary to allow Plaintiff to test his product at Loon Mountain.

98.  In a subsequent discussion between Boyne Resorts and Defendant Active Network/RTP it was made known to Boyne that there are no plans to provide the interface to Plaintiff. This was with the intention to prevent Plaintiff from competing with Skidata Defendants' gate products.

99.  When Boyne persisted that it wanted Plaintiff to have the interface, Defendant Active Network/RTP sent an email to Boyne Resorts that Boyne forwarded to Plaintiff stating that Defendant Active Network/RTP wanted several hundred thousand dollars from Boyne in order to provide the interface. A copy of the email is in Exhibit S.

100.  This was an outlandish amount for a very small effort. The Plaintiff did not want Defendant Active Network/RTP's intellectual property nor for them to change their product. He just wanted the software interface.

101.  An interface to Defendant Active Network/RTP's software is critical in order for Plaintiff to have a functional system for Boyne Resorts and other ski areas that use Defendant Active Network/RTP software.

102.  Defendant Active Network/RTP's control of the ski industry through its software and its conspiracy with Skidata Defendants to restrain Plaintiff from selling a competitive product is monopolistic, anticompetitive, and a restraint of trade.

103.  Exhibit O shows a current Internet advertisement for Active Network, LLC where the only other company mentioned is Defendants Skidata, AG.

104.  Exhibit P shows the number one importer of Skidata Defendants RFID smart cards is Defendant Active Network/RTP.

105. The collusion continues to this day and is being used to exclude the Plaintiff from entering the ski resort market for gate products.

106. Accesso Technology Defendants colludes with Axess Defendants. Mike Costantino who has been in the ski industry for over 10 years, actually thought that the gate products offered were a product of Accesso Technology Defendants. Mike Costantino said in his email statement, "and quickly offered up their Access (Axess) products." See Exhibit F.

107. The collusion was so pervasive that Mike Costantino actually believed that the gate products offered were manufactured by Accesso Technology Defendants.

108. Exhibit I is an email from Johnny Donaldson, an employee of Accesso Technology Defendants, who laid out the steps to acquire the software interface. According to this email, the request for the interface needs to come from a customer of Accesso Technology Defendants. Gore Mountain was to be that customer.

109. The request from Gore Mountain hadn't even gotten to the formal request stage. Mike Costantino just inquired about the driver for the Zebra printer when he was completely shut down by the Accesso Technology Defendants to stop working with the Plaintiff and use the product from Axess Defendants.

110. This was clear in Mike Costantino's email in Exhibit F. "Mostly I am not in a position to "ruffle feathers" with Siriusware as they are critical to the smooth operation of ORDA's many ticketing and sales system. Upon inquiring about the Zebra drivers we were immediately informed that Siriusware does not support 3rd party/gate solutions and quickly offered up their Access product."

111. Notwithstanding that the Accesso Technology Defendants already had an interface to the Zebra printer as <u>Exhibit Q</u> clearly shows on page 44.

112. The Accesso Technology Defendants are clearly in collusion with Axess Defendants because the normal response would have been an email or verbal reply to Mike Costantino, similar to what the Plaintiff received from Johnny Donaldson (See <u>Exhibit I</u>). Mike Costantino would have let the Plaintiff know what the proper steps are to secure the interface.

113. Another normal response would have been for the Accesso Technology Defendants to contact the Plaintiff to start a business discussion. The collusive environment made the response totally abnormal.

114. The following sentence was added by Mike Costantino after he had, in effect, broken off the business relationship with the Plaintiff, "This is not to say they would not do it but a request like that would not be cheap and would have to come from the powers-that-be in Lake Placid."

115. The email in <u>Exhibit F</u> clearly shows collusion because of the way the business relationship was so suddenly stopped.

116. Without a proper interface to the Accesso Technology Defendants' software, the Plaintiff cannot sell products to the ski resort industry and a superior gate product will not become available to that industry.

117. The Accesso Technology Defendants are well aware of this fact and are using fear and intimidation to keep not just Gore Mountain but other ski resorts from using the Plaintiff's products.

118. There were ski resorts that were interested in Plaintiff's product that would suddenly stop interacting with the Plaintiff. One such ski resort is Wachusett Mountain Ski Area, located in Princeton, MA, that uses Accesso Technology Defendants' software.

119. In 2014 the Plaintiff gave a presentation to the president and other staff at Wachusett Mountain. In 2015 the Plaintiff met with other staff members at an industry trade show.

120. There appeared to be considerable interest but suddenly the staff of Wachusett Mountain stopped interacting with the Plaintiff. It was only several months later that the Plaintiff found out that Wachusett Mountain had purchased Axess Defendants gate products.

121. Sunapee Mountain Ski Resort, located in Newbury, NH is part of three mountain conglomerate that includes Okemo Mountain, located in Ludlow, VT and Crested Bute, located in Gunnison, CO. All three ski resorts use Accesso Technology Defendants' software.

122. In 2014 the Sunapee General Manager was very interested in Plaintiff's product so much so that he was willing to fund a beta test at Sunapee Mountain. After several months of enthusiasm, the interaction stopped suddenly.

123. The Plaintiff found out in 2015 that all three resorts purchased gate products from Axess Defendants. There are many other instances of similar circumstances that the Plaintiff can site.

124. Gore Mountain was honest about what happened and provided evidence in its candid emails. These communications from Gore Mountain clearly show collusion and damage to competition.

125. The Accesso Technology Defendants are in collusion with Axess Defendants, a direct competitor of Plaintiff's products, and are promoting Axess Defendants products to the detriment of Plaintiff's products as is indicated in <u>Exhibit F</u> where Mike Costantino explicitly states that Defendants "Siriusware does not support 3rd party scanning/gate solutions and quickly offered up their Access (Axess) product."

126. In the fall of 2016 Gore Mountain did not have a ticket verification solution for their Nordic track (see email from Mike Costantino in <u>Exhibit C</u>). The Plaintiff offered Gore Mountain a free solution that was available for the entire 2016 to 2017 winter season. The sudden rejection of this solution made no business sense unless collusion was involved.

127. Defendant Active Network/RTP is in collusion with Skidata Defendants, a direct competitor of the Plaintiff's products, and is promoting Skidata Defendants' products to the detriment of Plaintiff's products.

128. <u>Exhibits O</u> is an article that touts Active Network as a developer of business management software. The only gate product mentioned in the article is produced by Skidata Defendants

129. <u>Exhibit P</u> is a supply chain summary for Skidata Defendants It shows that the number one importer of smart (RFID) cards is the Defendant Active Network/RTP.

130. Accesso Technology Defendants and Defendant Active Network/RTP control of the ski resort industry through its software and their collusion with Axess Defendants

and Skidata Defendants, respectively, to restrain Plaintiff from selling superior and lower priced products is monopolistic, anticompetitive, and a restraint of trade.

131. Accesso Technology Defendants  have damaged Plaintiff's attempt to sell its products by keeping the software interface from Plaintiff and by intimidating Plaintiff's potential customers - Gore Mountain, Whiteface Mountain, and Belleayer in particular and, in general, any ski resort that uses the Accesso Technology Defendants' software.

132. Accesso Technology Defendants are in collusion with Axess Defendants and are keeping their software interface away from the Plaintiff. Without a software interface, the Plaintiff can't provide product demonstration and can't sell his products, making it financially impossible for the Plaintiff to stay in business.

133. Defendant Active Network/RTP is in collusion with Skidata Defendants and is keeping its software interface away from the Plaintiff. Without a software interface, the Plaintiff can't provide product demonstration and can't sell his products, making it financially impossible for the Plaintiff to stay in business.

134. As a result, the Defendants Accesso Technology Group, PLC and its subsidiary Siriusware, Inc., together with Axess International, AG and its subsidiary Axess North America, LLC and Defendant Active Network/RTP together with Skidata, AG and its subsidiary Skidata, Inc. have violated the Sherman Antitrust Act 15 U.S.C. Paragraph 1 to 7 and Clayton Antitrust Act 15 U.S.C. paragraphs 12 to 27 and 52 to 53.

135. The concerted action between two legally distinct economic entities, Accesso Technology Defendants and Axess Defendants, have caused an unreasonable restraint of trade.

136. As a direct result, damages have been caused to the Plaintiff.

137. The concerted action between two legally distinct economic entities, Defendant Active Network/RTP and Skidata Defendants, have caused an unreasonable restraint of trade.

138. As a direct result, damages have been caused to the Plaintiff.

139. As a result, the Plaintiff can't stay in business and has been damaged in the sum of $18,212,419.

## COUNT 2

## SHERMAN ANTI-TRUST ACT

140. Accesso Technology Defendants, together with Axess Defendants and Defendant Active Network/RTP together with Skidata Defendants collusive actions in preventing the Plaintiff from interfacing to critical ski resort management software and refusal to deal with the Plaintiff in providing the interfaces are a Per Se violation of the Sherman Antitrust Act 15 U.S.C. paragraph 1 to 7.

141. The ski resort industry is a highly concentrated market for resort management software and ski gate products.

142. The Accesso Technology Defendants have enormous power in the ski resort industry, controlling 40% of the larger ski resorts and have shown their collusion with Axess Defendants, a direct Plaintiff competitor.

143. The Defendant Active Network/RTP controls the other 40% and has shown its collusion with Skidata Defendants, a direct Plaintiff competitor.

144. All of the ski resort customers that have shown interest in Plaintiff's products use resort management software sold by either Accesso Technology Defendants or Defendant Active Network/RTP.

145. The 20% of ski resorts that don't use software from Defendant Active Network/RTP and from Accesso Technology Defendants are smaller ski resorts that would find it economically unfeasible to make the capital investment to purchase Plaintiff's products.

146. With 80% of the market controlled by Accesso Technology Defendants and Defendant Active Network/RTP and 20% of the market that would find it economically unfeasible to afford Plaintiff's products, the Accesso Technology Defendants and Defendant Active Network/RTP control almost 100% of the viable market for Plaintiff's products.

147. The Accesso Technology Defendants' actions, as shown in their response to Gore Mountain's legitimate request, prevents the sale of Plaintiff's superior and lower priced products to ski resorts. Ski resorts will continue to experience theft of service by patrons failing to purchase lift tickets and by lift ticket transfers. Consumers will be harmed by ski resorts raising lift ticket prices to compensate for these continued loses.

148. With Defendant Active Network/RTP collusion with Skidata Defendants, the Plaintiff can't sell his superior and lower priced product to ski resorts, Ski resorts will continue to experience theft of service by patrons failing to purchase lift tickets

and by lift ticket transfers. Consumers will be harmed by ski resorts charging higher ticket prices to compensate for these continued loses.

149. All of the Defendants' wrongful conduct has damaged competition and consumers are paying higher prices for lift tickets.

150. The monopolization of gate products for the ski resorts industry by Accesso Technology Defendants with Axess Defendants and by Defendant Active Network/RTP with Skidata Defendants have been successful. They are destroying competition and have built a monopoly.

151. The Defendants posses monopoly power in the gate product market and have willfully maintained this power. This is not by having a superior product, or through growth, or through development or through historic accident.

152. As a direct result, damages have been caused to the Plaintiff, to competition, and to the consumer.

153. In the alternative, Defendants have attempted to monopolize the market because there is a dangerous probability of success in monopolizing the market and, secondly, Defendants have a specific intent to destroy competition and/or build a monopoly, as set forth above.

154. <u>Exhibit H</u> is the Plaintiff's detailed business plan. It shows expected after tax profit over the next 6 years of $18,212,419.

155. In 2016 Plaintiff's after tax loss was expected to be -$94,250. In 2017 Plaintiff's after tax loss was expected to be -$102,813. In 2018 Plaintiff's after tax profit was expected to be $234,207, In 2019 Plaintiff's after tax profit was expected to be $473,002, In 2020 Plaintiff's after tax profit was expected to be $3,349,044, In

2021 Plaintiff's after tax profit was expected to be $5,808,681, In 2022 Plaintiff's after tax profit was expected to be $8,347,484, for a total of $18,212,419.

156. The source of the profit is from gate product sales, UHF RFID lift ticket sales, service contracts, software sales, and software maintenance sales.

157. Without Accesso Technology Defendants and Defendant Active Network/RTP providing the software interfaces and their collusion with Plaintiff's competitors, Axess Defendants and Skidata Defendants, respectively, the Plaintiff can't make any sales to the ski resort industry and will be denied the full amount of $18,212,419 by the egregious actions of all the Defendants.

158. Plaintiff is requesting damages from all Defendants for violating the Sherman Antitrust Act 15 U.S.C. paragraphs 1 to 7 and Clayton Antitrust Act 15 U.S.C. paragraphs 12 to 27 and 52 to 53 with their monopolistic business practices that restrain trade in the ski resort industry and prevent competition.

159. As a result of the Defendants' Per Se violation of the Sherman Antitrust Act 15 U.S.C. paragraphs 1 to 7 and Clayton Antitrust Act 15 U.S.C. paragraphs 12 to 27 and 52 to 53, the Plaintiff was damaged in the sum of $18,212,419.

160. The award of treble damages is authorized under the Sherman Antitrust Act in order to promote the interest of safeguarding a free and competitive society and to deter violators and others from future illegal acts. The Plaintiff is enjoining the court to provide $54,637,257 as compensation for the business that Plaintiff is prevented from competing for in a fair and equitable manner.

**COUNT 3**

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

161. Exhibit F clearly shows that the Gore Mountain IT Manager (Mike Costantino) did not want to "ruffle feathers with Siriusware as they are critical to the smooth operation of ORDA's many venue ticketing and sales systems."

162. Mike Costantino is the Information Technology officer for Gore Mountain. It is his job to make sure that all ORDA ticket venues operate smoothly. The threat that the Accesso Technology Defendants made endangered Mike Costantino's job.

163. In a rural area, where Gore Mountain is located, getting fired for endangering the smooth operation of ORDA's many venue ticketing and sales systems venues is considered extreme.

164. The Accesso Technology Defendants knew the power they had over Mike Costantino and forced him to stop working with Plaintiff's products.

165. When the Accesso Technology Defendants heard Gore Mountain was interested in using Plaintiff's product, Accesso Technology Defendants interfered with this relationship.

166. After the Plaintiff received the email in Exhibit F where Gore Mountain was breaking off relations with the Plaintiff, the Plaintiff sent an email to Mike Costantino imploring him to just set up a demo of the Plaintiff's products without an interface to Accesso Technology Defendants' software. This email from the Plaintiff to Mike Costantino is contained in Exhibit G.

167. The Accesso Technology Defendants had so intimidated Mike Costantino that he did not respond.

168. It made no business sense for Gore Mountain to break of the business relations with the Plaintiff. Gore Mountain needed a ticket verification system for its Nordic track and the Plaintiff was offering a free solution for the 2016/2017 winter season.

169. As a result of Accesso Technology Defendants becoming aware of Plaintiff approaching Gore Mountain, they interfered with Plaintiff's ability to continue his approach to do business, thus committing tortious interference with the Plaintiff.

170. As a result of the Accesso Technology Defendants' tortious interference with business relations, the Plaintiff was damaged in the sum of $18,212,419.

**WHEREFORE**, Plaintiff, HAROLD CHARYCH, demands judgment against Defendants, SIRIUSWARE, INC. ACCESSO TECHNOLOGY GROUP, PLC; ACTIVE NETWORK, LLC; VISTA EQUITY PARTNERS, LLC; SKIDATA, AG; SKIDATA, INC.; AXESS INTERNATIONAL, AG; and AXESS NORTH AMERICA, LLC as follows: (1) in an amount not less than $18,212,419 as actual damages for Restraint of Trade and (2) violation of the Sherman Antitrust Act with treble damages in the sum of $54,637,257 and (3) for Tortions Interference with Business Relations, together with the costs, disbursements, and any other fess associated with this action.

Dated: July 3, 2017 Suffolk, New York

By _____

HAROLD CHARYCH, Pro Se

2 The Overlook
Poquott, NY 11733 United States
1-631-371-9029

# UNITED STATES DISTRIC COURT
for the
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD CHARYCH<br>    Plaintiff,<br>          v.<br><br>(1) SIRIUSWARE, INC.,<br>    Unites States subsidiary of a United Kingdom entity<br>(2) ACCESSO TECHNOLOGY GROUP, PLC<br>    United Kingdom parent entity of SIRIUSWARE, INC.<br>(3) AXESS NORTH AMERICA, LLC<br>    United States subsidiary of an Austrian entity<br>(4) AXESS INTERNATIONAL, AG<br>    Austrian parent entity of AXESS NORTH AMERICA, LLC)<br>(5) ACTIVE NETWORK, LLC<br>    Formerly Resort Technology Partners, LLC<br>(6) VISTA EQUITY PARTNERS, LLC<br>    Parent company of Active Network, LLC<br>(7) SKIDATA, INC.<br>    United States subsidiary of an Austrian entity<br>(8) SKIDATA, AG<br>    Austrian parent entity of SKIDATA, INC.<br><br>        Defendants, | Civil Action No: 2:17-<br>cv-00468-JS-GRB<br>**VERIFICATION** |

I, Harold Charych the Plaintiff, having read the annexed Summons and Verified Complaint and

know the contents thereof are true to my knowledge, except as to those matters therein which I

stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: Suffolk County, NY: July 3, 2017

Signed, _Harold Charych_

_____
Harold Charych, Plaintiff

STATE OF NEW YORK, (COUNTY OF SUFFOLK)

On this date of _3rd of July_ in the year of _2017_

_Harold Charych_ personally appeared before me and executed this verification.

_____ Notary Public

Zachary F. Granato
No. 01GR6287399
Notary Public, State of New York
Qualified in Suffolk County
My Commission Expires on 8/10/17